United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

Nos. 96-1394/1490
_____

Paul Bevan,                              *
                                          *
    Cross-Appellant/Appellee,     *   Appeal from the United States
                                          *   District Court for the
v.                                        *   District of Minnesota.
                                          *
Honeywell, Inc.,                          *
                                          *
    Appellant/Cross-Appellee.     *


_____

Submitted: November 18, 1996

Filed: July 3, 1997
_____

Before FAGG, LAY, and HANSEN, Circuit Judges.
_____


HANSEN, Circuit Judge.

    Paul Bevan brought this age discrimination suit against his former employer, Honeywell, Inc., alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634 (1988 & Supp. IV 1992), and the Minnesota Human Rights Act (MHRA), Minn. Stat. Ann. §§ 363.01-363.15 (1991 & Supp. 1997). Bevan

won a jury verdict on the ADEA claim, which Honeywell appeals, and the district court found in favor of Honeywell on the MHRA claim, which Bevan cross appeals. Bevan also cross appeals the district court's award of attorney's fees. We affirm in part and reverse in part.

## I. Background

For the purpose of reviewing the ADEA claim, we recite the facts in the light most favorable to the jury verdict. See Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 731 (8th Cir. 1996). In May 1968, Paul Bevan began working for Honeywell as a field sales representative in New Jersey. He left Honeywell on good terms for a period of approximately six months in the 1970s, after which he returned to Honeywell as a branch manager trainee. During the late 1970s, Bevan was promoted to the position of branch manager in Santa Ana, California, on the recommendation that "[h]e is quick, intelligent, and talented with a desire for both challenge and success." (Appellee's App. at 42.) In 1981, he relocated to the Minneapolis area to serve as director of marketing for the Protection Services Division of Home and Building International. At that time, Honeywell's umbrella group, Home and Building International, was organized in three segments -- the Protection Services Division, the Commercial Buildings Group, and the Residential Building Control Division.

In January 1987, Bevan was named the director of systems marketing for the Commercial Buildings Group, selling hardware to perform climate control functions in commercial buildings. On the same day, Kevin Gilligan assumed the office of director of services marketing for the Commercial Buildings Group, maintaining and servicing the hardware after its installation. In 1988, Bevan's immediate supervisor was Richard Egan, vice president of marketing, manufacturing, and engineering for the Commercial Buildings Group. Egan reported to David Larkin, the vice president and general manager for the Commercial Buildings Group.

2

Honeywell's company personnel file and evaluations of Bevan reflect nothing less than positive improvement and above average performance on his part. Bevan always received high performance ratings in annual reviews. Consistent with these reviews, he was awarded regular merit raises throughout his career.

Although there were no negative comments in Bevan's performance evaluations concerning his management style or personality, Bevan decided to participate in a program at Personnel Decisions, Inc. (P.D.I.), designed to enhance his executive skills. Honeywell paid approximately $11,160 for his participation in the program. The assessment and evaluation reports from the program contained some negative comments about Bevan's confrontational style, noting that his "communication skills are hampered by his abrasive, domineering management style." (Trial Tr. at 467.) Bevan completed this program in early 1991 and immediately thereafter received positive comments about perceived improvements in his interpersonal skills. His last performance evaluation, which was conducted in the summer of 1990, reflected an outstanding performance rating, and Bevan was awarded a merit increase in salary effective January 1, 1991.

On January 1, 1991, a new president, Michael Bonsignore, was appointed for the Home and Building International operations. Bonsignore chose Manfred Fiedler to act as human relations planner, and Fiedler appointed Jack Ruppel, human resource manager, as his aide. Bonsignore began a "revitalization" campaign for the company. For years, Honeywell's human resource department had used an annual talent review process to identify talented persons who could be prepared to fill significant managerial positions on short notice if such a position became available due to illness or death of a management head. Prior to the revitalization campaign, this talent review process had always evaluated the talent pool in a neutral fashion, without regard to age. With the revitalization campaign came a change in this policy. Succession planning documents for the Commercial Buildings Group dated March 1991, included a list of high talent persons and their ages. With one exception, all were under age 50.

3

On May 16, 1991, Ruppel (human resource manager) sent a memo to the human resource heads of the three divisions within Home and Building International, requesting information pertinent to the talent review process. The memo asked the division heads to begin considering some specifically listed points that would be important for the 1991/92 developmental plan, noting that "various elements" of the review process would "be somewhat different from what you're used to." (Appellant's App. at 125.) The memo stated that the 1991/92 plan "requires your best thinking as to specific action plans to prepare your key talent and/or younger (35 year olds) promising talents." (Id.) The memo directed the department heads to "[f]ocus on your younger, promising talents (in the 35 year old range or younger)," and provided that each would have 45 minutes "to present 2-3 key or promising younger talents." (Id. at 126.) Finally, the memo warned that "candidates should not be compromises, but really excellent choices, specifically, younger, promising talents." (Id.) Larkin, vice president of the Commercial Buildings Group, testified that he received this memo. He said that he was disappointed with the language of the memo and that he thought Ruppel had misinterpreted the corporation's intent in searching out talent for the corporation's long-range leadership goals. In response to this reaction, Ruppel circulated a revised and "sanitized" memo which omitted the language directly evidencing a preference for the younger talent. Nevertheless, the human resources head for the Commercial Buildings Group, Ronald Pederson, responded to Ruppel's memo by identifying young, high-potential employees, all of whom, with one exception, were under the age of 50.

On October 14, 1991, Larkin reorganized the Commercial Buildings Group's marketing forces by combining what had been the systems marketing department (headed by Bevan) with the services marketing department (headed by Gilligan). Honeywell claimed that this reorganization was an effort to correct and eliminate disputes that existed between the actual sales and installation people and the people who were developing marketing policy and strategy, such as Bevan. This reorganization eliminated Dick Egan's position as vice president of marketing,

engineering, and production (Bevan's boss) as well as Bevan's position as director of systems marketing.

Bevan had been aware that this reorganization, combining the marketing and services departments, would take place at some time. Having received only positive feedback concerning his performance prior to that time, Bevan had remained confident that there would be a place for him in the new organization. On the day the reorganization was announced, Bevan had a previously scheduled meeting with Egan. Egan then informed Bevan that Bevan would no longer be in marketing and that Larkin had chosen Kevin Gilligan (who was 36 years old at the time) to be the vice president of the new unitary marketing and services department. Bevan asked Egan why he was being removed from marketing, and he responded that Larkin felt he (Bevan) would not be able to report to or support the younger Gilligan, because of Bevan's experience and age.

On December 13, 1991, however, Gilligan created a marketing position for Bevan as director of contractor marketing and distribution. Before beginning this new position, Bevan took three weeks of vacation, during which he had facial surgery in an attempt to look younger. Bevan had noticed that every new director-level person was under the age of 40 after the reorganization.

On December 20, 1991, one week after Gilligan announced Bevan's new position, Honeywell announced that it was combining the three separate units of Home and Building International -- the Protection Services Division, the Commercial Buildings Group, and the Residential Building Control Division -- into one integrated unit called the Honeywell World-Wide Home and Building Control Organization (H&BC). Bonsignore appointed Jean-Pierre Rosso, formerly the president of Honeywell in Europe, as president of the new H&BC. On January 20, 1992, when Bevan returned from his facial surgery to start his new position, he learned that Rosso had replaced David Larkin with Richard Cathcart and ordered that Bevan be removed

5

from marketing. Gilligan, then age 37, and Marty Griemal, age 34, assumed Bevan's responsibilities. Bevan was the only director-level marketing person within Gilligan's organization who was over the age of 45, and he was the only one removed.

Bevan was removed from his position, but he was not terminated for another five months and he was given no work in the interim. Several employees asked Bevan to help with projects during this time, but they never received permission to give work to Bevan. Honeywell represented to Bevan that it remained committed to finding him a position, and Cathcart and Ron Pederson, a human resources person, were allegedly attempting to help Bevan find a new opportunity within Honeywell. In reality, only three days after Bevan was removed from his position, Pederson had already prepared a termination agreement detailing the terms of Bevan's separation from Honeywell. At one point, Pederson reported to Bevan that Mannie Jackson, vice president of sales, had said he had a job for Bevan. Pederson told Bevan, "Unfortunately, Jean-Pierre Rosso blocked that." (Trial Tr. at 366.) Bevan was very interested in a branch manager opening in Los Angeles, and Pederson discussed this possibility with Brian McGourty, vice president of field operations. After this, Pederson reported to Bevan that "it's not getting easier. Jean-Pierre Rosso and Brian McGourty have got their own ideas about this organization." (Id. at 367.) McGourty did not offer Bevan the position but instead hired a 38-year-old man for the Los Angeles job. At one point, Pederson told Bevan, "It's getting tough to fit the old farts from Commercial Building group into this organization." (Id. at 367-68.) After this remark, Pederson, who was in his fifties himself, mused that he would likely also be affected by this new organization.

As further evidence of a youth movement and age-biased animus on the part of Rosso, Bevan presented a letter dated March 1992 from Loring Knoblauch, president of Honeywell Asian Pacific, addressed to Rosso. In the letter, Knoblauch asks Rosso to consider an employee named Wade Smith for a position in the new revitalized organization. Knoblauch apparently felt the need to plead that Smith not "be tarred with the same brush as some of his compatriots in Marketing." (Appellee's App. at

249.)  Knoblauch asked Rosso to find a place for Smith after the reorganization, even though Smith was not a "young high talent" like the "Stanford or Wharton kids" they were recruiting.  (Id. at 250.)

On April 20, 1992, Bevan was presented with a termination package, which included a requirement that Bevan sign a general release of all claims against Honeywell.  Bevan did not want to release his right to file an age discrimination suit.  On June 11, 1992, Bevan was informed that he must either take the termination package or be terminated.  Bevan refused to sign the general release, and Cathcart placed him on layoff status on June 17, 1992.

Bevan brought this age discrimination suit, alleging that Honeywell violated both the ADEA and the Minnesota Human Rights Act.  Bevan also alleged several common-law claims, which the district court dismissed before trial.  The ADEA claim was tried to a jury.

At trial, for its legitimate, nondiscriminatory reason for the adverse employment actions, Honeywell asserted that Bevan's argumentative personality and abrasive management style made him difficult to work with, caused tension between the group's field branch (sales and installation people) and the marketing branch (those making marketing strategies and policies such as Bevan), as well as conflict with the Europeans at a time when globalization was vital to the company.  Some Honeywell people testified that Bevan has an abrasive personality, resulting in a reputation among his peers and superiors as being confrontational, difficult, and argumentative.  While Bevan acknowledged such negative comments, he presented testimony that his interpersonal skills had much improved after his participation in the P.D.I. program in 1990.  John Kellebrew, Honeywell's vice president and general manager of the western area, who had attended heated meetings with Bevan and had often disagreed with Bevan, could not recall any time when he thought Bevan acted inappropriately.  Also, Kellebrew did not recall any tension or disputes between field and marketing.

7

Honeywell asserted that Bevan's personality cost him a promotional opportunity in February 1990 (not an employment decision at issue in this suit). At that time, Loring Knoblauch, head of the Honeywell Asia-Pacific organization, brought Bevan and his wife to Hong Kong to consider Bevan for a position there. Staff members in Hong Kong reported personality conflicts with Bevan after meeting him. Knoblauch decided that Bevan would not be culturally adaptable to the position and also that he lacked the necessary "people skills" and "tact." (Trial Tr. at 1291.) Bevan was not chosen for the Hong Kong position. Honeywell asserted that this was typical behavior for Bevan and that his personality ultimately prevented him from finding a suitable position within Honeywell after the reorganization.

Bevan offered his own version of the Hong Kong incident. He was disenchanted by certain cultural and societal aspects of life in Hong Kong, such as the huge economic disparity that is commonplace and the pervasive use of household servants. Consequently, he was happy not to be chosen for that position in 1990.

Additionally, Honeywell pointed to the P.D.I. program (where negative statements about Bevan's management style emerged) as proof that the adverse employment actions were due to Bevan's poor interpersonal skills. Bevan acknowledged the statements but asserted that diagnosing any managerial weaknesses was the purpose of the program. As noted above, Bevan demonstrated that immediately after participating in the program, he received compliments about his improved skills. Also, any such weaknesses were not enough of a problem to ever have been mentioned in any company evaluations of his performance.

The jury in the ADEA case returned special verdicts finding that age was a determining factor in Honeywell's adverse employment actions against Bevan, that Honeywell's conduct was not willful, and that Bevan was entitled to back pay in the amount of $275,217 and front pay in the amount of $214,137.

The MHRA claim was tried to the court.  Contrary to the jury findings, the district court found that Honeywell did not engage in unlawful age discrimination in violation of the MHRA and dismissed the state claim with prejudice.

Bevan applied for an award of attorney's fees roughly equal to the total jury award in this case.  The district court concluded that the fee application did not accurately reflect the relationship between the fee requested and the results obtained.  The court made an equitable adjustment, taking into account Bevan's limited success in this case, and concluded that $250,000 was a reasonable award of attorney's fees.  Both parties appeal.

## II.  Discussion
### A.  Judgment as a Matter of Law

Honeywell appeals, arguing that the district court erred in denying its motion for judgment as a matter of law on the ADEA claim.

> Judgment as a matter of law is appropriate only when the nonmoving party fails to present enough evidence to permit a reasonable jury to decide in his favor.  We do not judge witnesses' credibility, we give the nonmoving party the benefit of all reasonable inferences, and we look at the evidence in the light most favorable to him. The evidence must point unswervingly to only one reasonable conclusion.  This demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province.

Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996) (internal citations omitted).  In accordance with this principle, "we will not reverse a jury's verdict for insufficient evidence unless, after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned [such] a verdict."  Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997) (en banc), petition for cert. filed, 65

9

U.S.L.W. 3694 (U.S. Apr. 4, 1997) (No. 96-1571). In other words, judgment as a matter of law is not appropriate "'if reasonable persons could differ as to the conclusions to be drawn from the evidence.'" Id. at 844 (quoting Haynes v. Bee-Line Trucking Co., 80 F.3d 1235, 1238 (8th Cir. 1996)) (other internal quotations omitted).

Our standard for reviewing the sufficiency of the proof in an age discrimination pretext case[1] tried to a jury is set forth in Ryther, 108 F.3d at 836-38, 848; and is modeled on St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-512 (1993), Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981), and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973). A pretext case is one in which the plaintiff proves unlawful discrimination by presenting a prima facie case of discrimination, the burden of production then shifts to the employer to assert a legitimate, nondiscriminatory reason for the adverse employment action, and finally, the plaintiff must demonstrate that the employer's articulated legitimate reason for the adverse employment action is a mere pretext for age discrimination. Ryther, 108 F.3d at 836-37. Within this framework, the plaintiff is not required to present direct "smoking gun" type proof of discrimination in order to make out a submissible case for the jury. Id. at 836. The fundamental issue is "whether [the plaintiff] produced sufficient evidence to allow a jury reasonably to find that [the employer] intentionally discriminated against him on the basis of his age." Id. at 838.

The adverse employment decisions at issue are Larkin's October 1991 removal of Bevan from director of systems marketing and the appointment of Gilligan instead

---

[1]In the context of age discrimination, it is important to recognize at the outset that we are dealing with a pretext case, not a case of mixed motives; additionally, this is not a pretext case that arose out of a reduction in force. See Ryther, 108 F.3d at 836 n.1. At oral argument, Honeywell asserted for the first time that the adverse employment actions at issue in this case resulted from a reduction in force. Our review of the record satisfies us that the district court properly tried this case as one of pretext. We will not consider the belated argument that this claim arose from a reduction in force.

10

of Bevan; Rosso's January 1992 removal of Bevan from the position of director of contractor marketing; McGourty's rejection of Bevan with regard to the Los Angeles branch office; and Cathcart's ultimate decision to terminate Bevan from employment with Honeywell on June 17, 1992. Bevan established a prima facie case of discrimination, which required Honeywell to demonstrate a legitimate nondiscriminatory reason for the adverse employment decisions. On appeal, Honeywell argues that the evidence presented was not sufficient to raise an inference that Honeywell intentionally discriminated against Bevan on the basis of his age.

We have set forth above, in the light most favorable to the verdict, the evidence that was admitted at trial. Our review of the evidence convinces us that a reasonable jury could conclude that the company's revitalization campaign, instigated by Bonsignore, consisted of a new company policy to weed out the older leaders and replace them with talented young ones. Bevan's performance ratings had always been high, and although he may have had a somewhat abrasive management style, which he attempted to improve through the P.D.I. program, his performance ratings had revealed no criticism of his management style or personal conduct. Based upon the documentary evidence of Bevan's performance at Honeywell, the jury could have reasonably disbelieved Honeywell's assertion that Bevan's personality was the nondiscriminatory reason for Honeywell's adverse employment decisions.

The human resources department quite blatantly indicated in Ruppel's memo that age would be a major consideration in the talent review process. Additionally, Larkin and Pederson had both made age-based comments about Bevan. Larkin was a decisionmaker who was aware of Ruppel's memo emphasizing the identification of younger talent. He commented that Bevan would be unable to report to the younger Gilligan. Pederson was a human resources director who had responded to Ruppel's memo with age-based information and who was ostensibly in charge of helping Bevan find a suitable position within Honeywell after he was removed from marketing, but who also was at the same time preparing Bevan's termination package. Pederson told

11

Bevan that it was "getting tough to fit the old farts from Commercial Building group into this organization." (Trial Tr. at 367-68.)

Honeywell argues that stray remarks of nondecisionmakers such as Pederson and Ruppel are not sufficient to raise an inference of age discrimination. We agree that such comments, standing alone, would not raise an inference of discrimination. Ryther, 108 F.3d at 844. It is well-settled that stray remarks by nondecisionmakers, or remarks by decisionmakers that are unrelated to the decisional process, do not suffice to show that discrimination was a motivating factor in an employment decision so as to invoke the mixed motives framework of Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989). Nitschke v. McDonnell Douglas Corp., 68 F.3d 249, 253 (8th Cir. 1995); Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991). In a pretext case, however, such comments are "surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow," MacDissi v. Valmont Indus., Inc., 856 F.2d 1054, 1058 (8th Cir. 1988), thus providing "additional threads of evidence," Morgan v. Arkansas Gazette, 897 F.2d 945, 951 (8th Cir. 1990), that are "relevant to the jury." Ryther, 108 F.3d at 844. Pederson's statement that it was difficult to place "the old farts" in the new organization and Ruppel's human resources memo, which directly stated a company preference for younger talented individuals, constituted proper circumstantial evidence for the jury to consider in combination with all the other evidence.

Honeywell also argues that the alleged discriminatory statement by Larkin, who clearly was a decisionmaker, does not constitute proof of age discrimination, because the comment was irrelevant to the adverse employment decisions. Larkin removed Bevan from his marketing position in October 1991 and promoted Gilligan instead of Bevan. Viewed in the light most favorable to Bevan, the record indicates that Egan (Bevan's immediate supervisor) said, "Larkin felt that [Bevan] would not be able to report to Kevin Gilligan . . . because [Bevan] had a lot more experience, and [Bevan] was a lot older than he [Gilligan] was . . . ." (Trial Tr. at 259.) This statement is relevant to the jury's determination of whether Honeywell engaged in age

12

discrimination, because it evidences an age-based reason that factored into an adverse employment decision. Even accepting arguendo Honeywell's contention that the comment was not directly related to the adverse employment decisions (and as such is not, standing alone, direct proof of discrimination), statements of a decisionmaker that are unrelated to the adverse employment decision are nevertheless relevant to the jury's verdict when considered together with other evidence of pretext, such as a company trend toward younger employees. See Ryther, 108 F.3d at 844.

Honeywell contends that the statement attributed to Larkin was double hearsay and that the district court erroneously admitted it into evidence. By failing to timely object to the admission of this testimony, however, Honeywell failed to preserve this issue for appeal. Baxley-DeLamar Monuments, Inc. v. American Cemetery Ass'n, 938 F.2d 846, 854 (8th Cir. 1991). Even had the issue been preserved, we would find no error because each layer of the out-of-court statement was admissible as a statement of a party opponent. Fed. R. Evid. 801(d)(2)(D). See Thomas v. International Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995) (stating in an ADEA case that if the witness is testifying to what an authorized agent of the employer said, the statement is an admission of a party opponent).

Bevan demonstrated through his testimony and statistical charts that after the reorganization, the director-level positions were all occupied by younger individuals. Bevan was the only director-level person over age 45 in Gilligan's organization after it was reorganized, and he was the only one removed from that organization.

Honeywell contends that Bevan's statistical evidence was incompetent as a matter of law and should not have been considered by the jury on the issue of intentional discrimination. Honeywell objected to the admission of this statistical evidence for lack of foundation. The district court admitted the evidence in the jury trial, but in its written findings regarding the MHRA claim, the district court stated in a footnote that it found Bevan's statistical charts "unpersuasive" because they "assume

13

certain premises for which there is no foundation." (Appellant's Addend. at 24 n.19.) Notably, the district court did not retreat from its decision to admit the charts. Its "nonpersuasive" finding is one of weight, not admissibility.

We conclude that the district court did not abuse its discretion in admitting Bevan's statistical charts. Contrary to Honeywell's assertion, Bevan was not attempting to make a claim of disparate impact through statistics. Instead, as in MacDissi, 856 F.2d at 1058, he offered his statistics, which are more accurately described as charts compiled from information in Honeywell's personnel directory, as one component of Bevan's circumstantial proof that Honeywell's proffered reason for the adverse employment decisions was a pretext for age discrimination. Introduced for this purpose, "[Bevan's] quantitative evidence does not need to reach the degree of certainty required of plaintiffs who present no proof of discrimination besides a statistical pattern." Id. at 1058; see also id. at 1058 n.3 ("Even where quantitative evidence does not alone demonstrate discrimination to some judicially created standard of statistical conclusiveness, it is still relevant in conjunction with all other evidence in determining intentional discrimination."). Bevan's use of the evidence in an attempt to demonstrate a company-wide trend toward placing younger persons in director-level positions and eliminating older persons after the reorganization was permissible. See id. at 1059 ("company-wide statistics are useful in establishing the presence or absence of a general climate of age bias"). While Bevan's charts were not competent as statistical proof of intentional discrimination, they were admissible as probative circumstantial evidence of pretext to be considered with all other evidence of pretext.

Honeywell argues that the statistical evidence is not probative because it fails to analyze the treatment of comparable employees by a common decisionmaker. Bevan's charts demonstrate the age differences between directors before and after the reorganization of the three major divisions into the single unit named H&BC. All of Bevan's charts involve age comparisons between director-level persons before the reorganization and director-level positions after the formation of the H&BC. There was

evidence in this case that at least one of Bevan's adverse employment decisions (the removal of Bevan from his director-level position in the new H&BC organization) was taken at the specific direction of Rosso, the new president of the H&BC. Rosso, as president of the new organization, was a common decisionmaker to all director-level positions in the H&BC.

Certainly, "statistics must evaluate comparable employees to be meaningful indicators of pretext," Schultz v. McDonnell Douglas Corp., 105 F.3d 1258, 1259 (8th Cir. 1997), petition for cert. filed, (U.S. May 21, 1997) (No. 96-1855), and "statistical evidence that does not reflect significant differences among employees would be prejudicial and misleading." Id. at 1259-60. When a director-level employee claims age discrimination, use of company-wide statistics may provide the only comparisons available. It is significant that Bevan was not terminated for poor performance, which would be a significant difference between Bevan and other director-level employees, see id., and Bevan presented evidence to rebut Honeywell's assertion that he was selected for adverse employment action because of his personality. This record provides no other substantial differences between Bevan and the director-level employees in his charts. Cf. Hopper v. Hallmark Cards, Inc., 87 F.3d 983, 989 (8th Cir. 1996) (statistics comparing managerial-level employees discharged from other units and excluding other younger managers discharged just prior to the data did not raise a reasonable inference of age discrimination). Furthermore, Honeywell took full advantage of its opportunity to impeach the validity, impact, and meaning of the information on those charts. Although the district court found the charts to be unpersuasive in considering the MHRA claim, the jury, a separate fact finder, could reasonably and independently determine to afford them more weight in deciding the ADEA claim. We conclude that the charts were probative and not unfairly prejudicial or misleading.

Viewing the totality of the circumstances in the light most favorable to Bevan, we conclude that he presented sufficient evidence from which a reasonable jury could

15

find that Honeywell discriminated against Bevan on the basis of his age. His outstanding performance record that mentions no major interpersonal problems, Larkin's age-based statement about Bevan, the company's lack of effort at providing him a new opportunity, the youth movement in the company evidenced by Ruppel's memo, Bevan's charts, Knoblauch's letter to Rosso, and Pederson's observations, and also the proof of the elements of the prima facie case all combined to raise an inference of age discrimination sufficient to allow this case to go to the jury. As we stated in Morgan, "[a]lthough this was a close case, our task on review is not to act as the trier of fact." 897 F.2d at 951.

## B. Motion for a New Trial

Honeywell contends that it is entitled to a new trial because the verdict is against the greater weight of the evidence. Honeywell also contends that the district court improperly admitted into evidence Bevan's statistical evidence and the double hearsay statement attributed to Larkin.

"We review the denial of a motion for a new trial under an abuse of discretion standard." Schultz, 105 F.3d at 1259. A district court's determination that the verdict is not against the weight of the evidence is virtually unassailable. Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995). The admission of evidence is committed to the sound discretion of the district court, and we review only for a clear abuse of discretion. Slathar v. Sather Trucking Corp., 78 F.3d 415, 419 (8th Cir.), cert. denied, 117 S. Ct. 179 (1996); O'Dell v. Hercules, Inc., 904 F.2d 1194, 1200 (8th Cir. 1990). A new trial is not warranted on the basis of an evidentiary ruling unless the evidence was so prejudicial that a new trial would likely produce a different result. Schultz, 105 F.3d at 1259.

16

For the reasons set forth above, we conclude that the verdict is not against the weight of the evidence, and no evidentiary ruling the district court made warrants a new trial.

## C. Front Pay

In this case, the parties stipulated that reinstatement would not be a proper remedy. Thus, there is no dispute that an award of front pay in lieu of reinstatement is the proper remedy here. Over Honeywell's objection, the district court submitted the calculation of the front pay award to the jury. Honeywell contends that this was error, and we agree.

Our recent opinion in Newhouse v. McCormick & Co., 110 F.3d 635, 641-43 (8th Cir. 1997), controls this issue. Front pay is an equitable issue to be determined by the district court, taking all aspects of the case into consideration and reducing the award to its present value. See id. at 641. In Newhouse, we held that the determination of what amount of front pay to award is an equitable issue to be decided by the district court. Id. at 643. While the district court may, in its equitable discretion, submit the issue to a jury in an advisory capacity, the district court in this case improperly submitted the issue to the jury for a conclusive determination. Because this is contrary to our opinion in Newhouse, we reverse and remand this issue, instructing the district court to calculate a proper front pay award.

## D. The Minnesota Human Rights Act

Bevan cross-appeals the district court's finding in the MHRA claim that Honeywell did not engage in intentional age discrimination. The district court found that Bevan did not successfully rebut the legitimate nondiscriminatory reasons for Honeywell's adverse employment decisions. Bevan argues that he produced sufficient evidence to prevail on his claim.

17

The Minnesota Supreme Court has consistently construed MHRA claims in accordance with federal precedent, thus we review the MHRA claim under the same standards as we applied to the ADEA claim. Rothmeier v. Investment Advisors, Inc., 85 F.3d 1328, 1338-39 (8th Cir. 1996); Feges v. Perkins Restaurants, Inc., 483 N.W.2d 701, 710 (Minn. 1992). With respect to Bevan's ADEA claim, we affirmed the denial of Honeywell's motion for judgment as a matter of law under the standard that judgment as a matter of law is not appropriate "if reasonable persons could differ as to the conclusions to be drawn from the evidence." Ryther, 108 F.3d at 844 (internal quotations omitted). Two different fact finders may permissibly draw differing inferences from the same evidence. The district court was free to give greater weight to the evidence supporting Honeywell's articulated legitimate nondiscriminatory reasons than to Bevan's evidence of pretext. We have reviewed the record and conclude that the district court's findings and conclusions on the MHRA claim are supported by the record. Once again, we recognize our role is not to be the trier of fact.

## E. Attorney's Fees

We review an award of attorney's fees in an ADEA suit under an abuse of discretion standard. Lee v. Rapid City Area Sch. Dist. No. 51-4, 981 F.2d 316, 319-20 & 333 (8th Cir. 1992) (en banc).

Bevan sought attorney's fees in the amount of $440,394.66. The jury awarded Bevan $275,217 on his ADEA claim, Bevan received no liquidated damages, we are remanding the front pay award for a proper calculation by the district court, and the district court determined that Honeywell did not intentionally discriminate against Bevan in violation of the MHRA. The district court awarded Bevan $250,000 in attorney's fees. Bevan contends that the district court abused its discretion by not awarding the full amount of attorney's fees that Bevan claimed.

18

The district court criticized both parties for "over-lawyering" this case and concluded that the fee application did not accurately reflect "the relationship between the amount of the fee [requested] and the results obtained" in the suit. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). It is appropriate for the district court in making a fee award to balance "the amount of effort against the plaintiff's overall success." ARC v. Schafer, 83 F.3d 1008, 1011 (8th Cir.) (citing Hensley), cert. denied, 117 S. Ct. 482 (1996). "Partial success may justify only a partial fee award." Id. The district court adequately conducted this analysis, reviewing all the circumstances of this case, and made an appropriate equitable adjustment to the fee request. The district court provided a rational reason for the reduction of the award and did not abuse its discretion.

## III.  Conclusion

Accordingly, we vacate the jury's award of front pay, reverse the district court's decision to submit the front pay issue to the jury, and remand for the district court to calculate a proper front pay award in its equitable discretion. In all other respects, we affirm the judgment of the district court.

LAY, Circuit Judge, concurring and dissenting.

I concur in Judge Hansen's excellent opinion with one exception. I dissent from the vacation of the jury's award of front pay and the remand to the district court to calculate a proper front pay award in its discretion.

The court holds that our recent opinion in Newhouse v. McCormick & Co., 110 F.3d 635 (8th Cir. 1997), controls this issue. I must respectfully disagree. In Newhouse, after a jury had returned a plaintiff's verdict finding age discrimination under the ADEA, the district court faced the equitable decision whether to reinstate the employee or to award front pay. Under those circumstances, the district court does not

face the choice between reinstatement and front pay until the jury has made a finding of age discrimination under the ADEA. After the jury determines liability, the jury ordinarily will be discharged and the court then will hear from the parties regarding whether to reinstate or to award front pay.

In the present case the district court was not faced with that decision because the parties stipulated before the jury was instructed that reinstatement was inappropriate. The only issue remaining was whether the ADEA was violated and, if so, what the award of front pay should be. The court determined to submit this as a legal claim to the jury under appropriate instructions, and the jury included front pay as part of its award.

Under these circumstances, I feel the proper application of the Supreme Court's decision in Lorillard v. Pons, 434 U.S. 575 (1978), requires a jury determination of front pay. In Lorillard, the Court interpreted 29 U.S.C. § 626(c)(2) and found that Congress intended to confer a right to trial by jury in ADEA actions to determine "amounts owing" as a result of a violation of the Act. The Court did not specifically decide whether the jury should determine front pay. In Dominic v. Consolidated Edison Co., 822 F.2d 1249 (2d Cir. 1987), cited with approval in Newhouse, the Second Circuit held that both the determination of whether to award front pay and how much front pay to award are questions reserved to the district court's equitable discretion. However, Dominic and Newhouse are dissimilar to this case in one important regard: Neither case reached the court on the stipulated fact that reinstatement was not an appropriate remedy. The oblique discussions in Dominic and Newhouse do not mandate that determining the amount of front pay, once the question of reinstatement is out of the case, is an equitable issue suitable only for a judge's determination. Determining an appropriate amount of front pay to be awarded involves consideration of factual circumstances, and is an exercise juries perform in many kinds of litigation where litigants seek future wages. See, e.g., Martinez v. Union Pacific R. R., 82 F.3d 223 (8th Cir. 1996) (jury in FELA action determining injured employee's

20

impaired future earning capacity at particular employment); <u>United Paperworkers Int'l Union v. Champion Int'l Corp.</u>, 81 F.3d 798 (8th Cir. 1996) (reversing on other grounds where jury in Labor Management Relations Act case awarded front pay to improperly discharged employee); <u>Gander v. FMC Corp.</u>, 892 F.2d 1373 (8th Cir. 1990) (finding evidentiary support in products liability case for jury's award of past and future lost wages).  The fact that we are dealing with front pay under the ADEA should make little difference when the choice of reinstatement is precluded.  The issue at that point becomes a legal claim to be determined under the facts of the case.

To avoid any misunderstanding, I do not urge that once a judge determines that reinstatement is not a proper remedy that a jury should be recalled to determine the issue of front pay.  In that situation, the award and amount of front pay is an integral concern to be balanced together with the court's equitable discretion as to <u>whether</u> to order reinstatement.  That situation lends itself to the court's equitable discretion.  However, where the parties themselves formulate the issue by removing reinstatement as an option, there is no equitable issue remaining and the factual calculation of front pay becomes a purely legal claim that should be decided by the jury.  <u>Cf.</u> <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469 (1992) (holding money judgment incidental to injunctive relief is legal claim triable by jury).  If the district court determines the award cannot be supported by the facts of the particular case, the court may reduce the award accordingly.

In the present case, the court reviewed the jury's front pay award and entered judgment upon the verdict.  Under the circumstances, it seems to me inefficient and improper under the law to vacate the award only to have the trial court effect its own fact finding to decrease or increase an award already carefully considered.

I therefore dissent. I feel the order vacating the award of front pay is contrary to the ADEA and the Supreme Court's interpretation of the Act in <u>Lorillard</u>.[2]

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[2]Since I feel that the statute provides for legal relief under the circumstances, it is not necessary to comment upon whether the Seventh Amendment requires a jury trial on this fact issue.