**Richard D. RASMUSSEN, Plaintiff,**

v.

**QUAKER CHEMICAL CORPORATION and Robert M. Lower, Defendants.**

**No. C95–0351.**

United States District Court, N.D. Iowa, Cedar Rapids Division.

Jan. 2, 1998.

Wilford H. Stone, Susan H. Sibert, Lynch–Dallas–Smith–Harman, Cedar Rapids, for plaintiff.

Larry J. Cohrt, Swisher Cohrt, Waterloo, for defendants.

## ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to plaintiff's October 30, 1997, motion for an award of prejudgment interest, attorney fees, costs, and front pay (docket number 65); plaintiff's October 30, 1997, bill of costs (docket number 69); and defendant Quaker Chemical Corporation's October 31, 1997, judgment as a matter of law or for a new trial (docket number 71). The court held a hearing on these motions on December 29, 1997, at which the plaintiff was represented by Wilford Stone and Susan Sibert. The defendants were represented by Larry Cohrt.

## FINDINGS OF FACT

In this case, the plaintiff, Richard Rasmussen, was hired as a project engineer for Quaker Chemical Corporation in 1989. A project engineer's duties primarily involve selling Quaker Chemical's industrial lubricant products. However, the project engineers also have technical expertise that is used in solving customer problems associated with the products.

In the fall of 1993, the plaintiff was diagnosed with major depressive disorder and was determined to be an alcoholic. The two problems went hand-in-hand as the plaintiff had been using alcohol to self-medicate his depressive disorder. The plaintiff was prescribed medication, his condition improved, and he was able to function at his employment.

The plaintiff suffered from a number of problems in June of 1994. He stopped taking his Antibuse, he got drunk in a bar in Waterloo where one of his clients, John Deere, was entertaining customers from Germany. Later that month, plaintiff became depressed, drove to Chicago and attempted to commit suicide.

Throughout the late fall of 1994, the plaintiff continued to experience problems with depression. Ultimately, he was hospitalized just before Christmas. He remained in the hospital until the end of January 1995. His physician determined that the medications he was receiving needed a "jump start" to take effect and the plaintiff was scheduled to receive a series of electroshock therapy treatments.[1] After four electroshock therapy treatments, the plaintiff suffered a major side effect and the treatments were discontinued. One of the side effects that is common from such therapy is a loss of short term memory.

While the plaintiff was in the hospital his supervisor, Robert Lower, and the personnel director, Ann Williams, were attempting to discover the nature of plaintiff's problems and his prognosis for returning to work. His physician was told that the company was considering terminating the plaintiff. While the physician told the company to do what it had to do, the physician also told the company that plaintiff's disorder was treatable and that he could return to work and be productive. In fact, the company was informed on or about January 16, 1995, that the plaintiff would be likely to return to work by the end of January. Given the company's threat to terminate the plaintiff, he was very anxious to leave the hospital and get back to work.

Robert Lower demanded to meet with the plaintiff on February 6, 1995. He directed the plaintiff to meet him at Winifred's restaurant on First Avenue in Cedar Rapids. At the meeting, Robert Lower was extremely hostile to the plaintiff and was interrogating the plaintiff's wife about the nature of the electroshock therapy treatments. The plaintiff was offended that his condition was being referred to in a way that almost suggested that the plaintiff was not even in the room. A heated conversation ensued and the plaintiff was terminated.

The company maintained that the plaintiff resigned his position. This contention was refuted by a current employee of Quaker

---

1. The plaintiff and his wife disagreed as to whether the series involved eight or twelve treat-   ments.

Chemical's who holds a position similar to plaintiff's position in a different territory. This witness, Richard Stanford, has been a friend of Robert Lower for nearly 40 years. Quaker Chemical called on Stanford from time-to-time when employees suffered from alcoholism because Stanford himself is a recovering alcoholic since 1985. Stanford is also trained as a substance abuse counselor.

Stanford testified that the decision to terminate the plaintiff was deeply disturbing to Robert Lower. Stanford and Lower had "many deep conversations" about the termination which must have preceded the termination because the only thing that Stanford learned from Lower after the termination was that the situation "was over." Lower told Stanford that he was concerned about firing the plaintiff because the plaintiff appeared to him to be unstable and Lower was concerned that the plaintiff would be a physical threat upon being terminated. Accordingly, Stanford counseled Lower to do the firing in a public place.

The court has tried to reconcile defendant Lower's testimony with that of Mr. Sanford, the plaintiff, and others in a way that would suggest that Mr. Lower was simply mistaken in his perception of the plaintiff's intention to remain employed with Quaker Chemical. The court cannot do this and now believes that Mr. Lower's testimony concerning the plaintiff's resignation is simply a fabrication to avoid liability.

There was evidence that defendant Lower had tormented the plaintiff with the fact of plaintiff's disabilities. On one occasion the plaintiff and Lower met at a bar where Lower ordered a martini, drank it quickly, and exuberantly exclaimed his enjoyment of the drink. He then told the plaintiff something to the effect that he did not see how the plaintiff could abstain from drinking. On another occasion, Lower discussed the plaintiff's depression with him referring to the plaintiff as having a "screw loose." He also referred to the plaintiff and his Dr. Jekyll–Mr. Hyde personality.

One would think that it would be very easy to determine precisely the appropriate amount of front pay. In this case, that task is difficult. By the time the plaintiff was terminated he was making approximately $60,000 to $62,000 per year.[2] In his new job the plaintiff receives approximately $44,000 in salary and commissions. His salary and commissions at Quaker Chemical could be expected to rise as can his salary and commissions with his present employment. However, the dramatic increase in salary and commissions projected by the plaintiff had he stayed with Quaker Chemical is simply too speculative to be adopted. Thus, the court considers that it is appropriate to conclude that the current differential between his new employment and his old employment is approximately $17,000 per year.

The plaintiff has sales skills that have transferability beyond the company he is now with. In fact, the products that he now sells (lifts and hoists) have nothing to do with the products that he sold for Quaker Chemical (industrial lubricants). Thus, while it is appropriate to measure front pay in the short term by comparing his present position to his former one, this is not necessarily an appropriate model for comparison for the indefinite future. The court believes that damages based on the $17,000 differential are appropriate only for the next four years. Accordingly, the court awards the plaintiff front pay in the amount of $62,441 (discounted at 6% interest rate).

## CONCLUSIONS OF LAW

### Motion For Judgment As A Matter Of Law—Standard

Judgment as a matter of law is appropriate when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. *Fed.R.Civ.P.* 50(a)(1); *Lam v. Curators of The University of Missouri at Kansas City Dental School,* 122 F.3d 654, 656 (8th Cir.1997). In this case, the court must assume that the plaintiff's evidence is true and give him the bene-

---

**2.** His W–2 shows income of approximately $70,-000 but it includes $9,000 worth of benefits which he was required to spend on automobile

travel for his job. Accordingly, these expenses were included in income but then deducted as employee business expenses.

fit of all inferences that can reasonably be drawn from that evidence. *Krumwiede v. Mercer County Ambulance Service,* 116 F.3d 361, 363 (8th Cir.1997). Thus, all conflicts in the evidence are resolved in favor of the non-moving party, and the plaintiff should prevail if a reasonable jury could differ as to the conclusions to be drawn from the evidence. *Stoebner v. Lingenfelter,* 115 F.3d 576, 578 (8th Cir.1997). In ruling upon a motion for judgment as a matter of law, the court does not weigh or evaluate the evidence nor does it consider the credibility of the witnesses. *Id.*

### Motion For New Trial—Standard

Some of the defendants' arguments in support of the motion for a new trial allege errors committed at the first trial. The defendants also argue that the jury's verdict is excessive and against the weight of the evidence. In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence. It can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict. *White v. Pence,* 961 F.2d 776 (8th Cir.1992). However, a new trial is required only when necessary to avoid a miscarriage of justice. *Ray v. Wal–Mart Stores, Inc.,* 120 F.3d 882, 885 (8th Cir.1997).

### Analysis

■ This case was submitted to the jury on state and federal disability discrimination claims against Quaker Chemical Corporation and its agent, Robert Lower, who was the individual who actually terminated the plaintiff's employment. The court submitted the case against Robert Lower individually because there is still an open question under the Iowa Civil Rights Act as to whether an individual can be a defendant. The law of Iowa is clear, however, that punitive damages are not available under its Civil Rights Act and punitive damages are the only damages that were awarded against Robert Low-

er. For these reasons, the defendant's motion for judgment as a matter of law is granted to the extent that it seeks to set aside the $125,000 award of punitive damages against defendant Robert Lower.

■ The defendant also contends that the court erred in admitting and excluding certain pieces of evidence and that these errors entitle it to a judgment as a matter of law or a new trial. Specifically, the defendants contend that the court erred in admitting evidence of a contractual agreement to pay severance benefits. After hearing this evidence, the court granted the defendant's motion for judgment as a matter of law at the close of the plaintiff's case. The defendant contends that the jury heard inadmissible evidence of an offer of compromise. *Fed.R.Evid.* 408.

The severance pay claim was pleaded in the plaintiff's February 18, 1997, amended complaint. The defendant never filed a motion for summary judgment concerning this claim.[3] Thus, a defendant who knows of a claim and never seeks to have the claim adjudicated by way of summary judgment prior to trial should not be heard to complain that the plaintiff presented evidence to support that claim at trial.

■ The defendants also contend that the court erred in excluding evidence concerning the plaintiff's rowdy behavior on June 8, 1994, at a Holiday Inn in Waterloo, Iowa. The defendants' evidence would show that the plaintiff was drunk on that occasion and was bothering a delegation of persons from Germany who were visiting a John Deere facility. The court's recollection is that only one employee of Quaker Chemical was prepared to testify about the effect of this incident on the plaintiff's employment. It was the defendant's theory at trial that had Quaker Chemical learned of this incident, it would have terminated plaintiff's employment. *See McKennon v. Nashville Banner Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). However, because the defen-

---

**3.** The defendants filed a motion in limine regarding this evidence claiming that the severance discussion was an offer of compromise. The plaintiff's pleaded theory was that the severance packet was a contractually based employee bene-

fit. The court concluded that this issue of fact was not appropriately decided by the court in the context of a motion in limine because the same issue of fact was the merits of the claim.

dants' only evidence concerning the impact that this event would have had on the company was entirely speculative, the court excluded the evidence. The court's position is that the company must present unequivocal evidence that this event would have resulted in the plaintiff's termination.[4]

The defendants make the same record now in support of their objections to the jury instructions as were made prior to giving the instructions. The court addressed the instructions on the record at that time and believes that the jury was adequately instructed that alcoholics should be held to the same standards for job performance as those who do not suffer from alcoholism.

The verdict in this case is not excessive. The back pay award is solidly supported by the plaintiff's evidence. The defendants' claim that the plaintiff would have been terminated at a later date even if he were not terminated in February of 1995 was submitted to the jury and this claim was resolved against the defendants. Particularly instructive on this issue is the deposition of Robert Lower taken March 4, 1997, where the following question and answer were given:

QUESTION: Has anybody brought anything to your attention between February 6, 1995, and today's date that leads you to believe that Dick Rasmussen would have been terminated for any kind of misconduct or unacceptable performance or anything like that?

ANSWER: No.

QUESTION: So but for the fact that he resigned or was terminated, as we sit here today, March 4, 1997, Dick Rasmussen could still be working for Quaker?

ANSWER: Could be.

At trial, Robert Lower testified that he knew that the plaintiff had driven to Chicago on June 20, 1994, and believed that he had gotten drunk at a bar and had been in a knife fight. He did not terminate the plaintiff's employment on the basis of that belief. Based on this evidence, the court believes that the jury could properly find that the subsequent events cited by the defendant would not have been sufficient in the defendants' eyes to cause plaintiff's termination. The back pay award is therefore appropriate and not excessive.

■ In a hearing for unemployment benefits, a Pennsylvania commission found that the plaintiff had been terminated. The court granted the defendants' motion in limine to exclude evidence of this finding. The court did so because it appeared that the defendants did not participate in the hearing and because the question before the court involved a simple factual dispute for which the commission had no particular expertise. That is, the question as to whether the plaintiff resigned or was terminated at the Winifred's Restaurant meeting presents a factual dispute for which only a few persons could present direct evidence. All of them testified at trial.

On cross-examination, counsel for the defendants asked the plaintiff about representations he had made to the Pennsylvania commission. Plaintiff answered the question and volunteered the information that the commission had found that he had been terminated. The defendants did not move to strike the testimony and the court did not take up the matter sua sponte, probably for the same reasons. The court and defense counsel did not want to draw more attention to this piece of evidence. If asked, the court would have given a strong instruction to the jury that would have explained the fact that the defendants did not participate in that

---

**4.** By this, the court means that the employer must present evidence that it would have terminated the plaintiff's employment. The court is not saying that it would have to believe this evidence before it could be admitted. Without unequivocal evidence that the employer would use the information to terminate the plaintiff, the employer could introduce evidence of any objectionable behavior and simply let a jury determine whether, in retrospect, the plaintiff could have been terminated for other reasons. The teaching of *McKennon* is that such evidence cuts off the plaintiff's damages only if the employer shows that it would have terminated the plaintiff's employment.

hearing and that the jury would hear all of the evidence available on the question and would not need the expertise of a commission to resolve this simple factual dispute. Because it came in without objection, the court believes that this argument has been waived.

The plaintiff's comment must be put into perspective. The comment, while personally irritating to the court because of its impact on the parties' perception of the ability of the court to control the trial, could not realistically have affected the outcome of the case. The two most critical factual disputes were (1) whether plaintiff was terminated, and (2) whether the termination was motivated by plaintiff's disability. On the issue of whether the plaintiff was terminated, the plaintiff's comment about being found to have been terminated by the Pennsylvania commission was not 1% as important as the testimony of a current employee of the defendant and 40-year friend of Robert Lower testifying that he had many deep conversations with Lower preparing for the termination of the plaintiff. Everyone in the courtroom had to have been stunned by this evidence. The court is convinced that the plaintiff's comment had no true significance to the outcome of this trial.

### Future Equitable Relief

The employment discrimination laws provide the court with the discretion to order future equitable relief to compensate an injured person for what was lost due to discrimination. *Curtis v. Elecs. & Space Corp.*, 113 F.3d 1498, 1503 (8th Cir. 1997)(ADEA); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir.1993)(Title VII). While reinstatement of the plaintiff is one possible form of future relief, the Eighth Circuit has stated that reinstatement is not appropriate when there is "evidence of extreme animosity between plaintiffs and defendant employers." *Williams v. Kisco, Inc.*, 964 F.2d 723, 729 (8th Cir.1992)(quoting

*Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276, 281 (8th Cir.1983)).

Another future equitable remedy available is the award of front pay. *Newhouse v. McCormick & Co., Inc.*, 110 F.3d 635, 641 (8th Cir.1997). Front pay may be awarded in lieu of, but not in addition to, reinstatement. *Smith v. World Ins. Co.*, 38 F.3d 1456, 1466 (8th Cir.1994). A discrimination plaintiff is not entitled to front pay if he or she unreasonably refuses an offer of reinstatement. *Id.* The choice between the remedies of reinstatement and front pay is within the discretion of the court. *Id.* at 641. *See Bevan v. Honeywell*, 118 F.3d 603 (8th Cir.1997)(district court erred in submitting front pay issue to jury). However, in awarding front pay under the ADEA, the court is not free to reject or contradict findings by the jury on issues that were properly submitted to the jury. *Newhouse*, 110 F.3d at 641.

The plaintiff has the initial burden of proving the basis for a front pay award, after which the burden then shifts to the defendant to prove front pay inappropriate. *Curtis*, 113 F.3d at 1503. In determining the appropriate amount of a front pay award, the court must consider all aspects of the case and reduce the award to its present value. *Bevan*, 118 F.3d at 613. While the Eighth Circuit has not provided a strict formulation for determining a front pay award, the Sixth Circuit has provided the following list of factors: the plaintiff's duty to mitigate; the availability of employment opportunities; the period within which one by reasonable efforts may be reemployed; the plaintiff's work and life expectancy; the use of discount tables to determine present value of future damages; and any other relevant factors. *Roush v. KFC Nat. Management Co.*, 10 F.3d 392 (6th Cir.1993), *cert denied*, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).[5] The Eighth Circuit has stated that a plaintiff's efforts to mitigate must be honest and made in good faith but, ultimately, such efforts need not be successful. *Hukkanen*, 3 F.3d at 286.

---

5. *See generally Davoll v. Webb*, 968 F.Supp. 549, 558 (D.Colo.1997)(factors other than work life expectancy to consider when assessing front pay award include salary and benefits at time of termination, any potential increase in salary through regular promotions and cost of living adjustments, reasonable availability of other work opportunities, period within which plaintiff may become reemployed with reasonable efforts, and methods to discount any award to net present value).

The calculation of front pay is necessarily uncertain and is a matter within the sound discretion of the trial court. *Hukkanen*, 3 F.3d at 286. Damages in the form of front pay should extend only to the date that the "sting" of the discriminatory conduct has ended. *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir.1992), *cert. denied*, 507 U.S. 915, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993). Front pay awards are by nature speculative, but they cannot be unduly so. *Id.* The longer a proposed front pay period, the more speculative the damages become. *Id.* (quoting *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir.1990)).

### Punitive Damages

The defendants contend that the verdict against Quaker Chemical for punitive damages in the amount of $100,000 cannot stand. Under the Americans With Disabilities Act, punitive damages may be awarded in cases of intentional employment discrimination if the complaining party demonstrates that the employer engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. *Barber v. Nabors Drilling USA, Inc.*, 130 F.3d 702 (5th Cir.1997).

■ This court believes that the evidence was sufficient to go to the jury on the issue of punitive damages. The evidence cited above, including Mr. Lower's extremely insensitive remarks about the nature of plaintiff's condition combined with the manner in which the plaintiff was terminated, show that the jury was within its authority in awarding punitive damages. Specifically, the termination occurred immediately on the heels of plaintiff's electroshock therapy. Mr. Lower's attitude demonstrated his ignorance of and insensitivity to plaintiff's course of treatment. He employed his personal perception of the effect of electroshock therapy on an individual despite the fact that a physician had specifically told Quaker Chemical that the plaintiff was capable of productive activity. Finally, the fact that the jury could find that Mr. Lower lied about the termination could appropriately be considered in this regard.

### Prejudgment Interest

In light of the $100,000 award of punitive damages, this court exercises its discretion against an award of prejudgment interest on the back pay award. The court would have awarded prejudgment interest if the punitive damage award had not been returned in plaintiff's favor.

### Breach of Contract

■ At trial, the plaintiff was also successful in claiming that the company had refused to honor its commitment to give plaintiff a 30–day notice of termination and to pay him for those 30 days. The jury awarded $2,083 for this breach of contract. The defendant contends that these damages are duplicative of the back pay award for disability discrimination. The plaintiff contends that the harm suffered for breach of contract is separate and distinct from the harm suffered from disability discrimination.

While the plaintiff correctly states that the cause of action for breach of contract is separate and distinct from the claim for disability discrimination, the damages flowing from these separate causes of action are not separate and distinct. The award of $2,083 for breach of contract represents wages lost by the plaintiff in the first month following his termination. Under the definition of back pay given to the jury in the disability discrimination jury instruction, these damages are the same damages that plaintiff suffered during that month because of the disability discrimination. For this reason, the court sets aside the award of $2,083 for breach of contract damages. It is duplicative of the plaintiff's award of back pay for the disability discrimination.

### Attorney Fees and Costs

■ The plaintiff has submitted an attorney fee application requesting attorney fees in the amount of $76,484 and costs in the amount of $2,777.52. The defendants' main criticism of the fee application is that they do not believe two lawyers were reasonably necessary for the prosecution of this action. The defendants also object to the large number of hours spent by a legal assistant imme-

diately prior to trial and the number of hours devoted to legal research. Finally, the defendants contend that since the jury denied plaintiff's request for emotional distress damages, it is appropriate to deny fees devoted to the pursuit of these damages.

The trial of this case was no more and no less difficult than a typical employment discrimination case in federal court. The fact that it involved the Americans With Disabilities Act with disabilities of depression and alcoholism made it legally more complex than the typical employment discrimination case. Because the plaintiff lives in the Southern District of Iowa and worked in the Northern District of Iowa for a company with its principal place of business out of state, the question of venue was of particular legal concern to the plaintiff early on.

It is this court's experience that approximately half of the parties who appear before the court for employment discrimination trials are represented by more than one lawyer. This is equally true for defendants as it is for plaintiffs. When this occurs, there is invariably a certain amount of duplication of effort for which a paying client ought not be billed. Counsel for the plaintiff were well prepared for the trial of this case and they achieved excellent results. Still, the 160 hours spent in trial preparation and the 60 hours of pre-trial research are excessive.

The court's initial reaction was that the plaintiff's fee claim should be reduced by approximately 15%. The court then independently concluded that 60 hours of trial preparation time and 20 hours of research time should be deducted.[6] Both of these thoughts suggested that a $65,000 fee is appropriate. The defendants object to the plaintiff's charge of 15¢ per page for photocopies. They also object to the $220 charge for a partial transcript of Mr. Sanford's trial testimony for use in Mr. Stone's closing argument. The court believes that the $220 transcript is not appropriately taxed to the defendant as it was simply ordered for the convenience of counsel in delivering his clos-

ing argument. The court rejects the defendants' argument concerning plaintiff's photocopying charge.

Upon the foregoing,

IT IS ORDERED

1. Plaintiff's motion for an award of prejudgment interest, attorney fees, costs, and front pay are granted and denied as follows. The Clerk of Court shall file an amended judgment in favor of the plaintiff and against defendant Quaker Chemical Corporation in the total amount of Seventy–Seven Thousand Six Hundred Twenty–Three Dollars ($77,623) for back pay, Sixty–Two Thousand, Four Hundred Forty–One Dollars ($62,441) in front pay, One Hundred Thousand Dollars ($100,000) in punitive damages, Sixty–Five Thousand ($65,000) in attorney fees, and Two Thousand Five Hundred Fifty–Seven Dollars and fifty-two cents ($2,557.52) in costs. The motion is denied in all other respects.

2. Defendants' motion for judgment as a matter of law is granted to the extent that the court hereby sets aside the $125,000 punitive damage award against Robert Lower personally and the $2,083 judgment against Quaker Chemical on plaintiff's breach of contract theory. The motion is denied in all other respects. The motion for a new trial is denied.

---

**6.** Sixty hours of research is, of course, a week and a half of effort. While the court is convinced that $150 an hour is appropriate market rate compensation for Mr. Stone, a $150 an hour fee recognizes a degree of experience and skill that does not require nearly the same amount of time devoted to research as an attorney earning, for example, $100 per hour.