# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4038

_____

| | |
|---|---|
| Bonnie Wittenburg, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * Appeal from the United States |
| American Express Financial | * District Court for the |
| Advisors, Inc., | * District of Minnesota. |
| | * |
| Appellee, | * |
| _____ | * |
| | * |
| American Association of | * |
| Retired Persons, | * |
| | * |
| Amicus on Behalf of | * |
| Appellant. | * |

_____

Submitted: May 19, 2006
Filed: September 28, 2006

_____

Before BYE, HANSEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Bonnie Wittenburg, a former Equity Research Analyst for American Express Financial Advisors, Inc.'s ("AEFA") Equity Investment Department ("EID"), brought this employment discrimination suit against AEFA, asserting gender discrimination

and age discrimination in AEFA's termination of her employment. AEFA filed a motion for summary judgment, which the district court[1] granted. Wittenburg appeals, arguing that she presented sufficient evidence to support her age and gender discrimination claims. We affirm.

## I. *Background*

AEFA provides financial planning, advice, asset management, insurance, and annuities to clients, primarily through a network of financial advisors; in addition, AEFA manages mutual funds. In November 1998, AEFA hired Wittenburg, then age 46, to work in its Minneapolis office as an Equity Research Analyst in the Technology Sector of the EID. When AEFA hired Wittenburg, she was one of two female analysts in an approximately 26-person department. According to Raymond Hirsch, former Group Director of the Technology Sector, Wittenburg worked hard, displayed "excellent investment skills," and provided "first class service" to the portfolio managers. In fact, Wittenburg was named "Analyst of the Year" in 2000 because of her "outstanding efforts and achievements."

In Fall 2001, AEFA hired Ted Truscott as its Chief Investment Officer ("CIO") to manage all investment activity at AEFA. As CIO, Truscott directly supervises the senior portfolio managers in the EID who, in turn, supervise the associate portfolio managers and analysts. Analysts do not report directly to Truscott. Truscott subsequently promoted analyst Tom Mahowald to the position of Director of Equity Research, thereby making Mahowald Wittenburg's direct supervisor. Thus, Wittenburg reported to Mahowald, and Mahowald reported to Truscott.[2]

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2]In late 1999, when Mahowald was still an analyst, he had a conversation with Kay Doremus, a fellow analyst, about the chief of the investment department's comment that one analyst would be eliminated per year. Doremus expressed her fear

In February 2002, Truscott initiated a two-year project to redesign the EID. The redesign project involved the addition of three portfolio managers hired from a competitor, the creation of a new satellite office in Boston, and the merger or movement of certain funds to AEFA's satellite offices in San Diego, Boston, and New Jersey. In discussing AEFA's hiring of the three new portfolio managers, Truscott stated that AEFA planned on hiring more managers in Boston because AEFA "need[ed] to be competitive as the best fund families out there. We will hire talent where we feel we have gaps. That said, we are not averse to hiring younger portfolio managers or analysts and growing them."

As part of the February 2002 redesign plan, AEFA included a reduction-in-force ("RIF"), which, according to Truscott, was necessary and "related to the transfer of investment portfolios to the newly formed Boston office." The February 2002 RIF involved only portfolio managers. One of the portfolio managers terminated in the RIF was Al Henderson, age 62. According to Henderson, Dan Rivera, Head of the Equities Department and a decisionmaker in the February 2002 RIF, told him that he was fired because AEFA wanted to retain "those that were younger" because younger employees have "more years of service ahead of them."

The second RIF occurred in June 2002 and was, according to Truscott, "related to the transfer of portfolios to the then being established San Diego office." This RIF primarily impacted portfolio managers; however, three analyst positions in Minneapolis were also eliminated.[3] As part of the redesign process, a team comprised

to Mahowald that she would be fired because she received a written performance warning. Mahowald agreed that AEFA tended to terminate one person per year, but he commented that "you have to make concessions because a lot of these guys are the sole support for their families." At the time, Doremus was the major breadwinner for her family.

[3]A document entitled "Equity Investments Group Strategy: Reorganization Impacts," shows a total analyst reduction of seven analysts in the June 2002 RIF.

of Human Resources Relationship Leader Judith Forker, Mahowald, Portfolio Managers Dan Rivera, Warren Spitz, Gordon Fines, and Human Resources personnel Patty Bales and Craig Dewald, created a talent review of the approximately 25 people in the department. This review included performance ratings for each analyst for the years 1999, 2000, and 2001, unless the analyst had not been employed during some or all of those years. In addition, the review evaluated the analyst's independent researching skills, communication skills, and whether the analyst was a team player. The review also indicated whether the analyst was a "keep," "maybe keep," "maybe," "maybe drop," or "drop." These ratings were generated to educate the leaders about the individuals working in the department and to identify employees in the department that might be affected by the reorganization.

In late 2002, the EID held its ratings alignment meeting attended by Truscott, Mahowald, Forker, Director of Compensation Sherry Johnson, and Portfolio Managers Spitz, Fines, Rivera, John Schonberg, and Jim Johnson. The group first discussed Mahowald's proposed ratings for each of the analysts, including Wittenburg. The proposed ratings were subject to change based on the group's discussion.[4] Mahowald's proposed rating for Wittenburg was G3/L3, but after the

Three analysts would be displaced, two analysts would be transferred, and two analysts would make "assumed moves" to the portfolio team.

[4]At the end of each year, AEFA reviews employees' performances. Each employee receives two ratings at the end of the year: one for goal achievement, the "G" rating, and one for demonstration of leadership competencies, the "L" rating, with 1 being the highest rating and 5 being the lowest rating. The year-end performance evaluation begins in September with the entry of performance data for each analyst into AEFA's human resources system. This data includes analysts' self-appraisals, which were submitted to Mahowald for his review and comments, and a preliminary performance rating determined by Mahowald based on the comments of portfolio managers, his own comments, and the information available to him at the time with respect to analysts' recommendations verses the "S&P 500" and the investment "universe."

ratings alignment meeting, her 2002 rating was lowered to a G4/L3. The other Technology Sector analysts' ratings in 2002 were: G3/L3 for David Friedrichsen (age 40), G3/L1 for Kurt Lauber (age 35), and G3/L1 for Dean Ramos (age 39).

Wittenburg's low rating in 2002 was mainly because of her poor performance on funds and negative input she received from portfolio managers. Although Wittenburg was the only analyst to complete a special project that Mahowald assigned, which consisted of picking up unrated stocks in the fourth quarter of 2002, her ratings on those stocks did not help the portfolio managers make money and consequently was not a positive consideration in her rating.[5]

Wittenburg complained about her 2002 rating to Mahowald. At that time, she asserted that her G4 rating was too low based on "Starmine" data for 2002. Starmine rated Wittenburg's 2002 performance highly, awarding her four stars out of a maximum of five stars. Wittenburg, however, acknowledged that Mahowald did not have access to the Starmine information on her 2002 performance when he gave her the G4 rating. Mahowald agreed with Wittenburg about what the "Starmine" data showed, but he disagreed that the data should have impacted her performance rating, considering AEFA does not use the Starmine data for evaluating performance.[6]

_____

[5]Wittenburg was not assigned a special "private placements" project that Mahowald assigned to Ramos and Lauber. Ramos and Lauber received L1 scores, in part, because of this special project. Mahowald testified in his deposition that AEFA "had significant private placement activities and we had a portfolio that had lots of private placements in it and those stocks that went into that portfolio needed to be covered by the analysts. And so if that private placement was done in that analyst's area of expertise, they logically had extra work to do to research and recommend and otherwise monitor that investment."

[6]When counsel for AEFA asserted that AEFA did not use the Starmine data for evaluating performance, Wittenburg agreed, stating, "That is correct. But AEFA did feed Starmine data. They had our data."

According to Mahowald, "Starmine was a system that [he] was looking at to evaluate analysts' performance. [He] started that in 2003. In doing so, [AEFA] fed Starmine historical data [for] 2002." AEFA uses Starmine as an "analyst tool."

In September 2003, Truscott informed Mahowald that a third RIF would occur. In October 2003, Mahowald, Forker, Chief Administrative Officer Pete Gallus, Director of Compensation Sherry Johnson, Schonberg, Spitz, and Bales met to determine how many analysts AEFA would need to cover each of the sectors of mutual fund products located in Minneapolis. They determined that AEFA only needed to retain one Technology Sector analyst based on business need; therefore, three of the four Technology Sector analyst positions would be eliminated. To implement the RIF, AEFA used the multiple incumbent process.[7] Consistent with that process, the performance ratings of analysts for 2002 and, in the event of a tie, 2001, were used in determining which analysts within each sector to terminate. Like all other analysts, Wittenburg's 2002 ratings were used.

With regard to the Technology Sector, AEFA terminated Wittenburg, age 51, in the third RIF, along with Friedrichsen, age 41, and Lauber, age 36. Only Ramos, age 40, was retained. All of the sectors combined had a total of 17 analysts, 11 of which were 40 years or older and 2 of which were women. Ultimately, of the 7 analysts selected for job elimination, 4 were 40 years or older and 1, Wittenburg, was a woman. AEFA retained 51-year-old Sandy Hollenhorst, who was hired by Mahowald in 2001.

AEFA notified Wittenburg of her position elimination on November 18, 2003, in a meeting with Truscott and Forker. Wittenburg asked why AEFA selected her

---

[7]AEFA applied the multiple incumbent process to analysts by sector—financial, consumer, industrial, health care, and technology—as opposed to grouping all of the analysts into one big "pool" as AEFA did in the 2002 RIF.

position for elimination. Truscott and Forker explained that the decision was based on AEFA's desire to keep only one Technology Sector analyst; therefore, based on her low 2002 rating, she was identified as one of the three analysts for termination. When Wittenburg told Truscott that she disputed her G4/L3 rating, Truscott, according to Wittenburg, "start[ed] going on about in '02 people did not rate the six rated stocks." Wittenburg, however, did not respond to Truscott. She was upset that she "was not given credit" for "getting the six rated stocks" because she was the only person in her department who had. Wittenburg's employment with AEFA ended on January 9, 2004. According to Wittenburg, within hours of her termination, Mahowald spoke with her and said, "Your husband has a job, doesn't he?"

After her termination, Wittenburg sought a position as a portfolio manager at AEFA but was not hired. She subsequently brought suit against AEFA, asserting claims of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, gender discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, and gender and age discrimination under the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.41. Wittenburg now appeals the district court's grant of summary judgment to AEFA on her gender discrimination and age discrimination claims.

## II. *Discussion*

Wittenburg argues that the district court erroneously granted summary judgment to AEFA on her age and gender discrimination claims because material issues of fact remain unresolved.

We review the district court's grant of summary judgment de novo. *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir. 2005). Therefore,"our task in this appeal is to decide whether the record reveals issues of material fact that would prevent the entry of summary judgment in favor of [AEFA]." *Id*. at 860. In completing this task, we are mindful that we "do not sit as a super-personnel

department to review the wisdom or fairness of [AEFA's] job-elimination policies during the RIF." *Id*.

We apply the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This analysis requires the plaintiff to establish a prima facie case of discrimination. *Id*. We, like the district court, assume without deciding that Wittenburg established a prima facie case of both age and gender discrimination.[8]

In addition, both parties agree that AEFA proffered a legitimate, non-discriminatory reason under the *McDonnell Douglas* test for Wittenburg's termination in the November 2003 RIF: that AEFA conducted a RIF in 2003 based on financial and business reasons and terminated Wittenburg during the RIF on the basis of her low 2002 performance rating. Accordingly, our task is to determine whether a genuine issue of material fact remains whether AEFA's non-discriminatory reason was pretextual. *Id*. at 804.

## A. *Age Discrimination*

Wittenburg argues that she presented sufficient evidence from which a reasonable fact-finder could conclude that age played a role in her termination and that AEFA's proffered reasons for her termination are pretextual.

---

[8]To establish a prima facie case of age discrimination resulting from a RIF, the plaintiff must show that (1) she is at least 40 years old; (2) she was qualified for the job; (3) she was discharged; and (4) age was a factor in the employer's decision to terminate her. *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 855 (8th Cir. 2003). To establish a prima facie case of gender discrimination, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job; (3) she was subjected to an adverse employment decision; and (4) she was treated differently than similarly-situated males. *Hesse v. Avis Rent A Car Sys.*, 394 F.3d 624, 631 (8th Cir. 2005).

First, Wittenburg relies on the following statements of AEFA personnel to support her age discrimination claim: (1) Truscott's statement that AEFA is "not averse to hiring younger portfolio managers or analysts and growing them;" (2) Forker's 2002 notes indicating that the analyst department would "maybe add a junior person;" and (3) Rivera's comment during the February 2002 RIF that AEFA wanted to retain "those that were younger" because they have "more years of service ahead of them."

A plaintiff must establish "*some* causal relationship" to show "the significance of [decisionmakers'] non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 779 (8th Cir. 1995) (emphasis in original). Therefore, we consider factors such as (1) whether the statements were made by employees who took part in the decision or influenced the decision to terminate the plaintiff; (2) the time gap between when the statements were made and the date of termination; and (3) "whether the statement itself" is "an exhibition of discriminatory animus" or merely an "opinion that such animus might exist." *Id.*; *see also Frieze v. Boatmen's Bank of Belton*, 950 F.2d 538, 542 (8th Cir. 1991) (holding that comments from the president of the company did not "create a reasonable inference of discrimination" because the president's comment to the employee that he had "waited too long . . . to start [his] effort towards becoming president of a bank and [the employee] would never make it" was made four years before the employee was discharged and before the president was actually the president).

Truscott, a decision-maker, made a general statement regarding the company's willingness to hire younger workers. Such a generalized statement does not evince a discriminatory policy or practice, nor does it tend to establish that age was the basis for Wittenburg's termination over a year later. The facts as alleged by Wittenburg do not establish any causal connection between Truscott's statement and her termination.

Likewise, Forker's reference to "junior person" in her notes does not show discriminatory intent. Wittenburg has failed to present evidence that Forker equated "junior person" to a "younger person" or how such a notation relates to her termination in the 2003 RIF.

Additionally, Wittenburg admits that Rivera was only a decisionmaker in the initial phase of the department downsizing, not in the 2003 RIF. Rivera's comment could be characterized as a non-contemporaneous, non-decisionmaker's opinion about company retention policy during a prior RIF. Taken together, these comments by AEFA personnel fall short of establishing pretext in AEFA's stated non-discriminatory purpose given for her termination.

Second, Wittenburg points out that AEFA "got rid" of the eight oldest analysts in the department by the end of the "two-year makeover plan" and gave four of the five oldest analysts low G4 or L4 ratings in 2002, thereby setting them up for termination in the 2003 RIF.[9] Wittenburg, however, ignores evidence that several members of the protected class survived the RIFs. Out of 31 analysts affected by the 2002 and 2003 RIFs, 17 were 40 years old or older. Of those 17 analysts, 6 were terminated, 4 resigned, and 7 survived the RIFs. In comparison, of the 14 analysts in the non-protected class, 4 were terminated, 2 resigned, 2 were transferred to the hedge fund, and 6 survived the RIFs. Also, of the 20 analysts evaluated, Steve Schroll, age 46, and Paul Stocking, age 41, both members of the protected class, ranked 1st and 2nd, respectively, in the 2002 analyst rankings. In addition, the two analysts terminated with Wittenburg from the Technology Sector were both *younger* than she—Friedrichsen, age 41, and Lauber, age 36. Furthermore, Hollenhorst, who was the *same age* as Wittenburg in 2003 (age 51), was *not* terminated during the 2003 RIF.

---

[9]Only six of the eight analysts were actually terminated; two of the analysts resigned.

Third, Wittenburg argues that Mahowald demonstrated age discrimination by rating Wittenburg a "maybe drop" during the June 2002 RIF, while ranking younger employees with lower scores in the "keep" category.[10] Wittenburg, however, survived this first round of layoffs. In addition, of the three analysts selected for termination in the June 2002 RIF, only two of the three analysts were over 40 years of age. Furthermore, Wittenburg does not challenge AEFA's contention that these performance ratings were not used in the 2003 RIF.

Fourth, Wittenburg challenges AEFA's explanation for the RIFs, noting that Truscott stated that the RIFs were for cost-cutting, while AEFA represented to the

---

[10]Wittenburg labels these "younger" analysts as receiving lower scores than her scores. However, a close examination of the scores reveals their scores were comparable to or better than Wittenburg's scores. Three of the "younger" analysts—Tom Howell, Henry Kaczmarek, and Paul Stocking—all received higher "G" ratings than Wittenburg in 2001. The other two analysts—Laton Spahr and Mark Thompson—received the same "G" rating as Wittenburg in 2001. For 2000, Stocking received a higher "G" rating than Wittenburg, Howell and Kaczmarek received a lower "G" rating than Wittenburg, and Spahr and Thompson were not yet employed at AEFA. For 1999, Wittenburg did receive a higher score than Howell, Kaczmarek, and Stocking, but Spahr and Thompson were not yet employed at AEFA.

As for the other categories, Wittenburg ranked the same as Spahr, Thompson, and Howell, in the "independent research" category, while Kaczmarek and Stocking ranked higher than Wittenburg. In the "focus on key investment metrics" category, Wittenburg again ranked the same as Spahr, Thompson, and Howell, while Kaczmarek and Stocking ranked higher than Wittenburg. In the "opinions, convictions" category, Spahr, Thompson, Kaczmarek, and Stocking ranked higher than Wittenburg, while Howell ranked the same as Wittenburg. In the "all comm." category, Wittenburg ranked higher than Howell, Kaczmarek, and Stocking, and the same as Spahr and Thompson. In the "team player" category, Wittenburg ranked slightly higher than the five analysts. Finally, in the "visible" category, Wittenburg ranked higher than Thompson, Howell, Kaczmarek, and Stocking, while ranking the same as Spahr.

district court that the RIFs were done to improve performance funds and *not* for cost-cutting. Truscott consistently testified, however, that the reason for the RIF was to redesign the EID, moving analysts positions from the Minneapolis office to the satellite offices. In addition, Truscott testified specifically about the 2003 RIF, stating that it was to employ the portfolio manager model and to reduce costs in the EID. A company need not provide evidence of financial distress to make an RIF "legitimate." *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 956 (8th Cir. 2001). Truscott never represented that cost reduction was *not* a consideration for the 2003 RIF. Rather, AEFA's counsel apparently made such a statement during argument to the district court where she stated that "cost cutting" was not a reason for the RIFs. However, arguments of counsel are not evidence. *See United States v. Mullins*, 446 F.3d 750, 760 (8th Cir. 2006).[11]

Fifth, Wittenburg asserts that AEFA's reliance on her 2002 "G4/L3" rating to justify her termination is pretextual because (1) Mahowald conducted the performance evaluation knowing that there could be another RIF within the department in 2003 and that his performance ratings would determine which analysts would be eliminated; (2) Mahowald failed to present Wittenburg with a written review of her rating; (3) she received a high rating from Starmine based on the same performance data that AEFA used; (4) inaccuracies appear in the 2002 performance evaluation; (5) other similarly situated employees outside of her protected class received more favorable ratings; and (6) AEFA used a single year's performance evaluation to justify her termination.

---

[11]We also reject this challenge as it applies to Wittenburg's gender discrimination claim.

-12-

Wittenburg relies on an email[12] that Dewald sent to Mahowald in April 2002 to prove that Mahowald knew that another RIF could occur in 2003. However, the email does not establish that fact. Dewald said that "Option 2 may become a mute [sic] point 18 months from now," indicating a lack of certainty. Furthermore, after the June 2002 RIF, Mahowald sent an email to the EID stating that "[t]here is no second shoe to drop."

Regarding Mahowald's failure to present Wittenburg with a written review of her rating, *no analyst*—either within the protected class or outside the protected class—received written reviews in 2002. In addition, Mahowald met separately with each analyst to orally deliver his 2002 year-end performance reviews.

Wittenburg's high Starmine rating is also insufficient to prove pretext. Wittenburg admits that Mahowald did not have access to her 2002 Starmine rating when he gave her the G3 rating, which was changed at the ratings alignment meeting to a G4. In addition, Wittenburg admits that AEFA never used Starmine data for evaluating performance.

As to the inaccuracies in her 2002 performance evaluation, Wittenburg points to an error by the hedge fund managers stating that she had recommended the purchase of a certain stock for several months when, in fact, she had the stock rated neutral for nearly the entire year. Wittenburg, however, does not allege that Mahowald knew of this "erroneous assumption" when he analyzed the portfolio manager feedback, which indicated below average results for Wittenburg. Also, although Wittenburg argues that the "L" rating is subjective, "the presence of subjectivity in employee evaluations is *itself* not a grounds for challenging those

_____

[12]Dewald's email to Mahowald stated that "while Ted [Truscott] may be thinking longer-term Option 2, I don't think this should deter you from driving Option 1. 2003/2004 is a long way off and if you can really make an impact with Central Research over time, Option 2 may become a mute [sic] point 18 months from now."

evaluations as discriminatory." *Hutson*, 63 F.3d at 780 (emphasis added). Instead, Wittenburg must present "affirmative evidence that [AEFA] manipulated the rating system" to discriminate against her on an impermissible basis. *Id*. Wittenburg attempts to meet this burden by arguing that she received an L3 rating despite being the only analyst to complete Mahowald's special project for 2002. However, Mahowald explained that although Wittenburg was the only analyst to complete the special project, her ratings on the stocks did not help portfolio managers make money and consequently was not a positive consideration in her rating. Mahowald also stated that her L3 rating was a direct result of the negative feedback portfolio managers gave Wittenburg.

Wittenburg next argues that Mahowald intentionally rated her lower in 2002 as a pretext for age discrimination. Wittenburg contends that similarly situated employees outside of her protected class were treated more favorably in terms of their L ratings. Specifically, she argues that Mahowald elevated the L ratings of Ramos, Lauber, and Steve Roorda by crediting them for completing a special "private placement" project that she was not assigned. Mahowald, however, explained that these analysts only received the special project because the private placements were "done in that analyst's area of expertise,[meaning that] they logically had extra work to do to research and recommend and otherwise monitor that investment." Furthermore, Wittenburg overlooks that, in 2002, Roorda, age 45, fell within the protected age group.

She also challenges her 2002 ratings based on AEFA's reliance only on the 2002 performance evaluations in deciding which analysts to terminate in the 2003 RIF. We have noted, however, that "[t]here is nothing inherently discriminatory in an employer choosing to rely on recent performance data more heavily than past performance in deciding which employees to terminate in a RIF," as this is a business judgment properly left to the employer's discretion. *Hutson*, 63 F.3d at 780. Truscott explained that AEFA measures analysts' performance in the "short run" because

-14-

"many consumers look at one-year performance and make their decisions on this" and because "the track record at American Express had been so terrible that we needed to see how we were doing on a one-year basis."[13]

Finally, Wittenburg argues that pretext is also shown by conflict in AEFA's statements and its hiring actions. According to Wittenburg, AEFA claimed it needed only one Technology Sector analyst but then immediately assigned significant Technology-Sector stock coverage to Industrial Sector analysts Roorda, age 45, and Larry Alberts, age 49, and advertised for analysts to fill two vacancies two months after the 2003 RIF. However, "[e]mployers often distribute a discharged employee's duties to other employees performing related work for legitimate reasons." *Frieze*, 950 F.2d at 541. To prove that her termination was because of her age, a plaintiff needs to present evidence that her "discharge was part of a pattern of [the employer's] discharging employees over forty and distributing their work to younger employees." *Id*. Here, Wittenburg has presented no such evidence.

Furthermore, Roorda and Alberts are actually in the same protected class as Wittenburg. However, because "the ADEA prohibits discrimination on the basis of age and not class membership," we look to whether the replacement is "substantially younger" than the plaintiff. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Therefore, we may not "rely on an arbitrary above 40/below 40 rule." *Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1413 (8th Cir. 1997) (holding that plaintiff's age discrimination claim failed where "[t]wo positions were filled by individuals older than or the same age as [the plaintiff]. Four positions were filled with individuals younger than [the plaintiff]. However, of these four positions, the largest age disparity between [the plaintiff] and the individual hired for the job was

---

[13]We also reject Wittenburg's assertion that AEFA's reliance on her 2002 "G4/L3" rating to justify her termination is pretextual as it relates to her gender discrimination claim.

five years."). We conclude that Roorda and Alberts are not "substantially younger" than Wittenburg, as the largest disparity between Wittenburg and Roorda is six years.

As to AEFA advertising to fill two vacancies two months after the RIF, the two vacancies arose from among the ten *surviving* analyst positions. Therefore, AEFA did not create two new analyst positions after terminating Wittenburg. And, although Wittenburg argues that posting the new positions as "multiple sector" positions demonstrates pretext because AEFA had previously rejected "pooling" analysts, Wittenburg has failed to show that the postings were for a job substantially similar to her Technology Analyst position.[14] Accordingly, we hold that Wittenburg has failed to prove pretext in her age discrimination claim.[15]

## B. *Gender Discrimination*

Wittenburg next asserts that she presented sufficient evidence of gender-based animus and proved that AEFA's proffered reason for her termination was a pretext for gender discrimination.

First, Wittenburg points out that, at the time of her hiring, she was only one of two female analysts in a department of 26 analysts. The number of female versus male analysts is relevant; however, it alone is insufficient to show discriminatory animus.

---

[14]As to Wittenburg's gender discrimination claim, we also reject her argument that evidence of pretext can be found in AEFA's assigning Technology Sector stock coverage to two male Industrial Sector analysts and advertising for analysts to fill two vacancies shortly after the 2003 RIF. Regarding vacancies at AEFA after the 2003 RIF, AEFA actually hired Penny Kyle to fill the associate portfolio manager position.

[15]Because the same analysis applies to MHRA claims as ADEA claims, Wittenburg's MHRA age discrimination claim also fails. *Ace Elec. Contractors, Inc. v. Int'l Bhd. of Elec. Workers, Local Union No. 292*, 414 F.3d 896, 900 (8th Cir. 2005).

Second, Wittenburg argues that she proved gender-based animus because of Mahowald's comment to Doremus that "you have to make concessions because a lot of these guys are the sole support of their families." Just as in *Frieze* where the president's comment was made four years before the employee was discharged and before the president was actually president, Mahowald made this comment four years before the 2003 RIF and before he was hired to run the EID. Therefore, Wittenburg has failed to show a causal relationship between Mahowald's 1999 comment and her termination in 2003.

Third, Wittenburg notes that Mahowald hired Blair Brumley, age 39, as an analyst weeks after the June 2002 RIF. Mahowald hired Brumley after two *males* were terminated in the 2002 RIF. Wittenburg contends that Mahowald told her that he was hiring Brumley because he had been unemployed for ten months and that Mahowald "also talked about Blair's [Brumley] family." Wittenburg argues that Mahowald's statement expressed his preference for "male breadwinners." Assuming that Mahowald's statement could be thus construed, Wittenburg's proof of gender discrimination in her termination is lacking.

Fourth, Wittenburg relies on a comment Mahowald made within hours of her termination in which he stated, "Your husband has a job, doesn't he?" In review of summary judgments we accord the nonmoving party all reasonable inferences. Inferring gender basis on this statement alone is not reasonable. In the absence of other proof, Mahowald's question does not show he terminated Wittenburg on the basis of her gender. Mahowald hired the second female analyst, Sandy Hollenhorst, in 2001 and AEFA retained Hollenhorst during the 2002 RIF.

Fifth, Wittenburg cites AEFA's retention of Ramos as the sole technology analyst who is, according to Wittenburg, a "historically lower performing male." Even if Wittenburg did "historically" perform better than Ramos, only the 2002 ratings were used in the 2003 RIF. Wittenburg does not dispute that Ramos's 2002 ratings

were better than her ratings. In addition, Ramos was retained over two male technology analysts—Friedrichsen and Lauber.

Finally, Wittenburg points to evidence that AEFA distributed technology duties to two male employees who had little or no technology stock experience after her termination. As we previously noted, it is permissible for an employer, after an RIF, to distribute a terminated employee's duties to retained employees. Therefore, we hold that Wittenburg's gender discrimination claim also fails.[16]

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

[16]Because the same analysis applies to MHRA claims as Title VII claims, Wittenburg's MHRA gender discrimination claim also fails. *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005).